CASE 47.—ACTION BY L. B. SIMMOND'S ADMINISTRATOR
AGAINST JOHN P. SIMMONDS.—April 23, 1909.

## Simmonds v. Simmonds

Appeal from Logan Circuit Court.

W. P. SANDIDGE, Circuit Judge.

From the judgment defendant appeals and plain-
tiff prosecutes a cross appeal. Reversed on defend-
ant's appeal and affirmed on the cross appeal.

1.  Gifts—Personal Property — Evidence—Sufficiency. — Evidence
    held to show a gift of personal property by a mother to her
    son and a delivery thereof in her lifetime.
2.  Gifts—Gift of Notes Without Delivery.—A daughter of the do-
    nor having possession of notes, can not defeat a gift of such
    notes to a son by refusing to surrender possession, and thus
    prevent delivery, where it was understood by all the parties
    that such gift was intended.

OPINION OF THE COURT BY JUDGE HOBSON.—Re-
versing.

Mrs. L. B. Simmonds was the widow of C. N. B.
Simmonds, who died a resident of Logan county,
Ky., about the year 1890. At the death of her hus-
band, 70 acres of land were set apart to her as her
dower, and, in addition to this, she received the per-
sonal property exempt from distribution. She con-
tinued to reside on the dower land until her death,
on October 2, 1907. Her son, John P. Simmonds,
lived with her, and at her death claimed as his own
all the personal property on the farm. C. R. Reed
qualified as the administrator of her estate and
brought three suits against John P. Simmonds. In

the first he sought to recover the personal property referred to. In the second he sought to recover on a note executed by John P. Simmonds to J. W. Hutchins on May 20, 1898, for $1,783.89, subject to certain credits which reduced it to about $600 or $800; the note having passed by assignment to Mrs. Simmonds. In the third he sought to recover on a note for $103.40, executed by John P. Simmonds to his mother on October 17, 1899. John P. Simmonds defended all three of the actions on the ground that his mother had given him the property and the notes in her lifetime. The three cases were consolidated, and on the final hearing the circuit court adjudged to John P. Simmonds the personal property, but entered a judgment against him on the notes on the ground that there had been no delivery of the notes to him. From this judgment John P. Simmonds appeals, and the administrator prosecutes a cross-appeal.

The reason which the circuit court had for adjudging to John P. Simmonds the personal property, and not adjudging to him the notes, was that he had possession of the personal property, but did not have possession of the notes they being in the possession of his sister, Mrs. Ollie McReynolds, at the time of his mother's death. After her mother's death, Mrs. McReynolds delivered the notes to the administrator, and he brought suit upon them. The $103.40 note was executed for money which Mrs. Simmonds paid out for her son about the time the note was given. Several years later she paid off the balance due on the note for $1,783.89 through her son-in-law, Joe McReynolds. He testified that she then told him to deliver the two notes to his wife, and for his wife to

keep them for her.  John P. Simmonds testifies that
his mother asked Joe McReynolds to give her the
notes, and that he refused to do so, and that for this
reason she did not deliver the notes to him.  For
many years before her death, John P. Simmonds and
his family, consisting of his wife and three children,
had lived in the house with her.  She had three other
children, but none of the others looked after her
wants, and the taking care of the old lady fell upon
John and his family.  At the time of her death she
was blind.  She had been confined to her bed about
two years, and before that had been sick for a good
while.  She had lung trouble and had been blind
about two years before she died.  She had to be
bathed and dressed.  She required much attention
at night, and both John P. Simmonds and his wife
were up with her a great deal.  One witness says
that there were not two nights in two years that they
were not up with her.

S. S. McReynolds, who was a magistrate in the dis-
trict, testifies: "I was there twice.  She sent for me
twice, two different times.  Said she wanted to settle
up her business.  Said she was going to give all her
property to John.  Said she owed it all to John for
favors he had done for her, and she was going to
give it to him, I believe was the language, but she
never did tell me that she had given it to him."

Mrs. Sarah C. Metcalf, a neighbor, when asked
whether she ever heard her say anything about John
and his wife, makes this statement: "Yes, sir; said
she didn't have half enough to pay them.  Said she
didn't have half enough to pay John for his trouble.
Told me that out of her own mouth, said she wanted
John to have everything she had, and said she didn't

have half enough to pay him, and said there never was a son more faithful to his mother, and I know that was the case, because I was there enough to know.''

Virgil D. Simmonds, being asked the same question, gave this testimony ''She just said she was sick and not able to wait on herself, and that John waited on her more than any of the other children, and that she wanted him to have what she had, and that she was going to give it to him. Q. How many times did you ever hear her say that? A. I don't remember but twice. Q. I will get you to tell the court, as near as you can recollect, her exact words as near as you can quote them. A. I reckon I can. Q. How the subject came up, and what she said, and just how she said it? A. At one time it came up. John was agent for shears, in some kind of business, selling scissors anyway, and she got sick and said she wanted John to come home, and she kept on after him to come home, and John told her he was making a little money, and that he had debts to pay, and she just told him, says: 'John, I can't live without you, and if you will come home I will give you my property.' That is just the way she spoke it.''

The deputy sheriff, W. R. Bruce, who went to collect her taxes, testified thus: ''She told me on one occasion, talking about the taxes, she said that she had given everything she had to John, and that he would pay the taxes. I had a list of real estate against her, and she said she had given everything she had over to John to take care of her, that she was getting old and feeble, she said.''

Miss Florence Turner, who was an intimate friend, testifies as follows: ''It was in the months of Janu-

ary and February, 1907, while I, was staying with
her, that she told me what disposition she had made
of her property, both personal and real estate.  I
remember distinctly, at three different times when
I was staying with her, that she said she had given
all of her property, both personal and real estate,
to her son John P. Simmonds on account of the care
which he had given to her during her sickness.  I
never at any time asked her what disposition she ex-
pected to make of her property, but she told me of
her own free will.  She said that in case her daugh-
ter Ollie made any trouble for her son John about
the property which she had given him that she
wanted me to swear in court that she had given all
of her property, both personal and real estate, to her
son John P. Simmonds.  Mrs. Simmonds was sick
in bed at her home when she told me this, Ollie Mc-
Reynolds knew what Mrs. Simmonds had done with
her property, and said she was going to have her
part of it, and this is why Mrs. Simmonds told me
so many times what she had done with her prop-
erty.''

These witnesses are wholly disinterested.  They
are not contradicted or impeached in any way.  The
only testimony offered by the administrator was his
own deposition and that of Joe McReynolds, and
they do not contradict the testimony quoted.  Under
this evidence we think the circuit court properly
held that the personal property on the place had
been given to John P. Simmonds by his mother, and
that the gift had become complete by delivery, for
he had possession of the property, and she declared
that she had given it to him.

Some point is made in the brief that Miss Turner
says that Mrs. Simmonds stated that she had given

John all her real and personal property, when in fact she had no real property; but she did have the dower interest in the land, and what she meant was that she had given him all she had and had given him the use of the land while she lived. The judgment on the cross-appeal is affirmed.

As to the notes a different question is presented. Ordinarily, to support a gift there must be delivery; but if the notes were not in her possession, and McReynolds refused to deliver them to her so that she could deliver them to John P. Simmonds, he will not be allowed to say there was no delivery. His wife had the notes. The proof shows that she had declared that she was going to have her part of the estate. She and her husband had the administrator appointed, and they alone seem to be behind this suit. At least, the other two children have taken no part in it. A person will not be allowed to take advantage of his own wrong. McReynolds and wife will not be allowed to hold the notes against the will of Mrs. Simmonds, and thus prevent her from delivering them, and then claim that the gift to the son was not complete because there was no delivery. Mrs. Simmonds had nothing which she could deliver to the son as a symbolical delivery of the notes. She did all that she could do. McReynolds's wife undoubtedly had the notes, and Mrs. Simmonds was for this reason unable to deliver them to John P. Simmonds. Miss Turner shows that Mrs. Reynolds knew of the gift to her brother, and was determined it should not be carried into effect. The testimony of Joe McReynolds on cross-examination goes far to show that he coincided in his wife's plans. To allow them thus to prevent the gift from taking effect,

when the mother regarded the gift as complete, would be to exalt form above substance and to prostitute a rule of law to defeat the purpose for which it was intended.

Aside from this the proof shows that the personal property was of value about $300. The old lady was in a deplorable condition, and had been for years before she died, requiring attention almost similar to that required by an infant. The notes and personal property are no more than would reasonably compensate John P. Simmonds for his care of her. The proof shows that she told him that, if he would stay there and take care of her, he should have this property. He did stay there and take care of her. He paid her doctor's bills and burial expenses and the other expenses of her sickness. If we should say that the gift was not complete, it is manifest under the proof that the property is of no more value than the services which he rendered upon the express promise of his mother that, if he would stay there and take care of her, he should have the property. There is no equity in the plaintiff's case. The chancellor will not shut his eyes to the truth in matters of this sort, but, as in other questions involving the settlement of the estate of a decedent, will do justice between the parties. Whether we put the case upon the ground of gift or contract, the plaintiff should recover nothing of John P. Simmonds.

Judgment reversed, and cause remanded, with directions to dismiss the petition.